[Civ. No. 1512. Fifth Dist. Sept. 7, 1972.]

MURPHY SLOUGH ASSOCIATION, Plaintiff and Appellant, v.
JERRY NORBERT AVILA et al., Defendants and Respondents.

650

**COUNSEL**

Clawson & Jennings and Charles W. Jennings for Plaintiff and Appellant.

Pearson & Helding and Neil A. Helding for Defendants and Respondents.

## OPINION

**FRANSON, J.**[*]—Appellant appeals from a judgment after trial by court entered January 6, 1971, in favor of respondents on appellant's action to enjoin respondents from using any waters of the Kings River in the Murphy Slough channel. By stipulation the issues of the action were bifurcated and only the first issue was tried below and is the subject of this appeal: Whether a conveyance by a deed in 1908 to Laguna Reclamation District by respondents' predecessors in title of a certain strip of land severed riparian water rights from respondents' remaining lands lying south of the strip conveyed.

Appellant, an unincorporated association, alleged in its complaint that its action was brought on behalf of its members, the Riverdale Irrigation District, a public district, the Reed Ditch Company, a mutual water company, the Liberty Mill Race Company, a mutual water company, and Burrel Ditch Company, a mutual water company. Appellant was organized by its members for the benefit of certain water users on the Kings River to administer their water rights and provide for irrigation of their lands in the geographical area of the Murphy Slough, a tributary of the Kings River. The service area to which the water is delivered by appellant lies downstream from respondents' land, consisting of two parcels identified as lots 29, 30, 31 and 32 in Section 18, Township 17 south, Range 21 east, Mount Diablo Base and Meridian, of the Laguna De Tache Grant. A strip of respondents' land described as, "A strip of land 100 feet wide, 60 feet on the river side and 40 feet on the land side," which runs continuously across respondents' tract on the northern end of lots 29 through 32 where said lots abut the Murphy Slough, was conveyed by a deed dated March 2, 1908, executed by Joe Thomas and Mary Thomas, et al., respondents' predecessors in interest, to Laguna Reclamation District No. 779.[1] The deed also contained the names of other grantors who, along with the Thomases, conveyed similar strips of land from their respective parcels, which, together with the Thomases' two parcels, involved a total of 99 parcels. The deed recited that the grantors, ". . . the said parties of the first part, for and in consideration of the sum of *Ten Dollars* gold coin of the United States of America, to them in hand paid by the said party of the

---

[*]Assigned by the Chairman of the Judicial Council.

[1]Attached as Appendix 1 to this opinion is a diagram prepared from a map received in evidence as plaintiff's Exhibit "A" showing the Murphy Slough, respondents' land, identified as lots 29, 30, 31 and 32, and the 100-foot strip and levee conveyed by the 1908 deed running parallel to Murphy Slough.

second part [Laguna], the receipt whereof is hereby acknowledged, do by these presents, *grant, bargain and sell, convey and confirm* [emphasis added] unto the said party of the second part and to its successors and assigns forever, all the certain lots, pieces and parcels of land, situate, lying and being in the County of Fresno, State of California, and bounded and described *as follows* . . .

". . . . . . . . . . . . . . . . .

*"Together with* all and singular, the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining and the reversion and reversions, remainder and remainders, rents, issues and profits thereof."

Laguna Reclamation District No. 779 was organized in August 1907 for the express purpose of protecting the lands within the district from damage by periodic flood and overflow waters of the Kings River and to reclaim the lands embraced within the boundaries of the district.

On February 29, 1908, the trustees of the Laguna Reclamation District filed a petition with the Fresno County Board of Supervisors requesting an order appointing three commissioners to assess the lands within the district for the purpose of collecting $40,000, which the district estimated to be necessary for the improvement, extension and maintenance of the levees of the district. The petition stated that prior to the formation of the district levees were erected in such manner as to partially protect the territory within the district from floods and overflows; that the levees were constructed at the expense of the landowners protected thereby and would serve as a basis for future reclamation work by the district. The petition further stated that the trustees planned to complete the reclamation of the lands within the district by continuing the work already done, by widening and strengthening the levees already constructed, by constructing new levees where necessary to supplement the system and to clear away obstructions from the waterways adjacent to the lands of the district as to allow a free flow of water. Subsequent petitions were filed by the trustees of the district with the Board of Supervisors in 1912 and 1918, seeking additional assessments, and stating that the district's plan was to construct and maintain levees upon lands subject to Kings River flooding.

As is evident by the diagram attached as Appendix 1, respondents' land is immediately south of the strip of land conveyed to the reclamation district. A small segment of respondents' land which lies between the Murphy Slough and the levee is conceded by appellant to have retained riparian rights. At the time the reclamation district was formed levees similar to those depicted on the diagram had already been constructed on the lots in

question in almost identical positions to those of the present levees. In addition, respondents, at their own expense, in recent years performed construction work on a segment of the levee dissecting lot 32.

Respondents and their predecessors in interest have for a period in excess of 30 years pumped water from Murphy Slough under a claim of riparian right; they estimate that they take approximately 320 acre feet of water per year from Murphy Slough for irrigation use on their 80 acres.

Respondents introduced into evidence copies of two grant deeds, dated October 26, 1917, and May 17, 1926, from Laguna Lands, Ltd., a corporation, grantor, to Joe Cabral, grantee, conveying parts of lots 29 and 30, Section 18, Township 17 south, Range 21 east, M.D.B.&M. The deeds recited that the conveyance was subject to rights of way for reclamation levees, irrigation and drainage canals for the use and benefit of all lands on said grant, together with and including its proportionate riparian rights to the waters of the Kings River. Laguna Lands, Ltd. was one of the grantors in the 1908 deed here in question.

In answer to the first issue, the trial court found that while the grant to the district in 1908 was in form a deed conveying a fee interest, it was intended and understood by the parties to convey a perpetual right of way to the district to enable it to perform its reclamation functions, and as a consequence respondents' land south of the levee retained its riparian rights to the waters of the Murphy Slough unimpaired by the deed.

█ Appellant contends that the deed is clear and unambiguous on its face and conveyed a fee title, with the result that respondents' land south of the levee, no longer abutting Murphy Slough, lost its riparian status.

█ As a point of departure we must first decide the propriety of the trial court's considering evidence extrinsic to the deed in determining the nature of the interest conveyed.

In *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, at page 37 [69 Cal.Rptr. 561, 442 P.2d 641, 4 A.L.R.3d 1373], our Supreme Court ruled that the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 520-521 [67 Cal.Rptr. 761, 439 P.2d 889]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal. Rptr. 767, 402 P.2d 839]; *Hulse* v. *Juillard Fancy Foods Co.* (1964) 61

Cal.2d 571, 573 [39 Cal.Rptr. 529, 394 P.2d 65]; *Nofziger* v. *Holman* (1964) 61 Cal.2d 526, 528 [39 Cal.Rptr. 384, 393 P.2d 696]; *Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265]; *Imbach* v. *Schultz* (1962) 58 Cal.2d 858, 860 [27 Cal.Rptr. 160, 377 P.2d 272]; *Reid* v. *Overland Machined Products* (1961) 55 Cal.2d 203, 210 [10 Cal.Rptr. 819, 359 P.2d 251].) The court stated that a rule that would limit the determination of the meaning of a written instrument to its four corners merely because it seems to be clear and unambiguous would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained.

"If words had absolute and constant referents, it might be possible to discover contractual intention in the words themselves and in the manner in which they were arranged. Words, however, do not have absolute and constant referents. 'A word is a symbol of thought but has no arbitrary and fixed meaning like a symbol of algebra or chemistry, . . .' *(Pearson* v. *State Social Welfare Board* (1960) 54 Cal.2d 184, 195. . . .) The meaning of particular words or groups of words varies with the '. . . verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers (not excluding judges) . . . . A word has no meaning apart from these factors; much less does it have an objective meaning, one true meaning.' (Corbin, *The Interpretation of Words and the Parol Evidence Rule* (1965) 50 Cornell L.Q. 161, 187.) Accordingly, the meaning of a writing '. . . can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words. The exclusion of parol evidence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended. . . .' [Citations.]" *(Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* supra, 69 Cal.2d 33, at pp. 38-39.)

If the trial court decides after considering the extrinsic evidence that the language of the instrument in the light of all the circumstances is susceptible of either one of the two interpretations contended for, extrinsic evidence relevant to prove either of such meanings is admissible. (Civ. Code, § 1647; Code Civ. Proc., § 1860; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* supra, 69 Cal.2d 33, at p. 40; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665]; *Lemm* v. *Stillwater Land & Cattle Co.* (1933) 217 Cal. 474, 480-481 [19 P.2d 785]; 9 Wigmore on Evidence, § 2470, p. 227, fn. 11; Corbin, *The Interpretation of Words and the Parol Evidence Rule* (1965) 50 Cornell L.Q. 161, 187.)

That this interpretive rule is applicable to deeds as well as to contracts and wills, see *French* v. *Brinkman* (1963) 60 Cal.2d 547, 552-553 [35 Cal.Rptr. 289, 387 P.2d 1]; *Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d 512, 522; *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 224-225 [65 Cal.Rptr. 545, 436 P.2d 561]. Civil Code section 1066 provides: "Grants are to be interpreted in like manner with contracts in general, except so far as is otherwise provided in this article." See also *Willard* v. *First Church of Christ, Scientist* (1972) 7 Cal.3d 473, at pages 476-477 [102 Cal.Rptr. 739, 498 P.2d 987], where it is stated: ". . . we must realize that our courts no longer feel constricted by feudal forms of conveyancing. Rather, our primary objective in construing a conveyance is to try to give effect to the intent of the grantor. (*Boyer* v. *Murphy* (1927) 202 Cal. 23, 28-29 . . .; *Burnett* v. *Piercy* (1906) 149 Cal. 178, 189 . . .; *Barnett* v. *Barnett* (1894) 104 Cal. 298, 301. . . .) In general, therefore, grants are to be interpreted in the same way as other contracts and not according to rigid feudal standards. (Civ. Code, § 1066; *Dandini* v. *Johnson* (1961) 193 Cal.App.2d 815, 819 . . .; *Kraemer* v. *Kraemer* (1959) 167 Cal.App.2d 291, 300-301 . . .; *Biescar* v. *Czechoslovak-Patronat* (1956) 145 Cal. App.2d 133, 142-143. . . .)" (See also *Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11, 22 [92 Cal.Rptr. 704, 480 P.2d 320]; *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 293 [85 Cal.Rptr. 444, 466 P.2d 996]; *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525, 528 [72 Cal.Rptr. 785, 446 P.2d 785].)

Having decided that the extrinsic evidence is admissible for the purpose of determining whether the deed is susceptible of an interpretation contrary to its "plain meaning," we next turn to a consideration of the language of the deed in the light of the evidence.

The deed specifies a consideration of "the sum of Ten Dollars, gold coin." The conveyance involved a total of 13 grantors who conveyed property interests across 99 parcels of land bordering on the Murphy Slough and Kings River. The nominal consideration of $10 at the very least raises an uncertainty as to the nature of the interest conveyed. (*Tamalpais etc. Co.* v. *N. W. Pac. R. R. Co.* (1946) 73 Cal.App.2d 917, 927-928 [167 P.2d 825].)

While the deed uses the words "grant, bargain and sell, convey and confirm . . ." together with "the tenements, hereditaments and appurtenances thereunto" and the ". . . reversions, . . . remainders, rents, issues and profits thereof," it is patently silent as to riparian rights. On its face there is an uncertainty as to whether riparian rights are included in the grant. We recognize that a riparian right, rather than being merely incident to or appurtenant to the land, has been said to be a vested right

inherent in and a part of the land (*Gould* v. *Stafford* (1891) 91 Cal. 146, 155 [27 P. 543]; *Herminghaus* v. *South. California Edison Co.* (1926) 200 Cal. 81 [252 P. 607]) and passes by a grant of land to the grantee even though the instrument is silent concerning the riparian right (*San Francisco* v. *County of Alameda* (1936) 5 Cal.2d 243, 246 [54 P.2d 462]; *Miller & Lux Inc.* v. *J. G. James Co.* (1919) 179 Cal. 689, 691 [178 P. 716]; *Smith* v. *Corbit* (1897) 116 Cal. 587, 591 [48 P. 725]; *Hargrave* v. *Cook* (1895) 108 Cal. 72, 77 [41 P. 18]). Be that as it may, it would be absurd to conclude that riparian rights to the 100-foot strip were conveyed to the grantee, a reclamation district which had no power or authority to administer water rights for the benefit of its members. Even if it be concluded that riparian rights to the strip passed to the grantee under the statutory presumption (Civ. Code, § 1105), we have answered nothing as to the riparian status of the grantors' lands not included in the deed.

Appellant relies on the holding in *Anaheim Union Water Co.* v. *Fuller* (1907) 150 Cal. 327, 331 [88 P. 978], to the effect that once a riparian owner conveys a noncontiguous parcel absent a contrary expression he thereby severs the riparian rights from the noncontiguous parcel conveyed and argues from this that the 1908 deed severed the riparian rights to respondents' land south of the levee. This result does not follow. In *Anaheim* the defendant's land was originally part of the Jurupa Rancho estate which abutted upon the Santa Ana River. The original owner of the rancho subdivided and sold and conveyed parcels to third parties. Cases cited as authority for the court's conclusion (*Boehmer* v. *Big Rock Irr. Dist.* (1897) 117 Cal. 19 [48 P. 908]; *Alta Land etc. Co.* v. *Hancock* (1890) 85 Cal. 219, 229 [24 P. 645]; *Lux* v. *Haggin* (1886) 69 Cal. 255 [4 P. 919, 10 P. 674]) were construed to mean that the conveyance of a parcel not contiguous to the stream severed the parcel conveyed from the riparian rights of the lands abutting the stream, unless the conveyance declared to the contrary.

The rationale for the holding in *Anaheim* is explained in *Rancho Santa Margarita* v. *Vail* (1938) 11 Cal.2d 501, 538-539 [81 P.2d 533], as follows: "In a grant, the grantor has title to the land subject to the grant. The proposed grantee has nothing, and therefore . . . secures only such title as is granted. When the grant is silent as to riparian rights obviously such rights have not been conveyed *and remain with the grantor for the benefit of his retained lands* and for the benefit of other riparians. If the grant deed conveys the riparian rights to the noncontiguous parcel, that parcel retains its riparian status." (Italics added.)

As stated in *Hudson* v. *Dailey* (1909) 156 Cal. 617, at pages 624-625 [105 P. 748]: "A subsequent conveyance by one of the original owners,

of a part of the tract not abutting upon the creek, would not carry any riparian or other right in the creek, unless it was so provided in the conveyance, *or unless the circumstances were such as to show that parties so intended, or were such as to raise an estoppel.* If the tract conveyed was not contiguous, had never received water from the creek, and there were no ditches leading from the creek to it at the time of the conveyance, nor other conditions indicating an intention that it should continue to have the riparian right, notwithstanding its want of access to the stream, the mere fact that it was a part of the rancho to which the riparian right had extended while the ownership was continuous from it to the banks of the stream, would not preserve that right to the severed tract. The severance under such circumstances would cut off such tract from the riparian right. (*Anaheim W. W. Co.* v. *Fuller,* 150 Cal. 331. . . .)" (Italics added.) (See also *Holmes* v. *Nay* (1921) 186 Cal. 231, 237 [199 P. 325].)

Appellant's argument that the holding in *Anaheim, supra,* compels a finding that the 1908 deed effected a severance of riparian rights in lands not included in the conveyance is specious. Absent some expression of intent to convey or sever rights in lands not included in the conveyance, the grant must be deemed inapposite to a consideration of the riparian status of the excluded land.

We conclude that the overriding principle in determining the consequence of a conveyance of land insofar as riparian rights are concerned is the intention of the parties to the conveyance. In the instant case the transaction involved landowners who were concerned with the control of flood waters on the slough and river and with development of levees abutting on their property so as to reclaim their land south of the levees. The grantee, a newly formed reclamation district, announced its express purpose to be that of constructing and maintaining new and existing levees contiguous to the river and slough and at no time was there evidence of an expressed or implied intention to acquire a fee ownership of riparian rights or to administer or furnish water to the grantor landowners. (Compare *Copeland* v. *Fairview Land etc. Co.* (1913) 165 Cal. 148 [131 P. 119]; *Arroyo D. and W. Co.* v. *Baldwin* (1909) 155 Cal. 280 [100 P. 874]; *Carlsbad etc. Co.* v. *San Luis Rey etc. Co.* (1947) 78 Cal.App.2d 900 [178 P.2d 844].)

The grant deeds in 1917 and 1926 by Laguna Lands, Ltd., a corporation, one of the grantors in the 1908 deed, which recite that the parcels conveyed are subject to rights of way for reclamation levees, irrigation and drainage canals, and include proportionate riparian rights in the waters of Kings River, unmistakably reflect the belief on the part of the grantor, Laguna Lands, Ltd., that in 1908 it had retained riparian rights to the land

south of the levee and that its grantee acquired only a right of way for reclamation purposes. Subsequent acts of the parties to the transaction which disclose the interpretation given to the conveyance by themselves is strong evidence of the interest conveyed. (*Fresno Irr. Dist.* v. *Smith* (1943) 58 Cal.App.2d 48, 58 [136 P.2d 382]; *City of Santa Cruz* v. *Younger* (1963) 223 Cal.App.2d 818, 821 [36 Cal.Rptr. 253].) Also, the evidence is uncontradicted that respondents have been taking water from the Murphy Slough continuously for the past 30 years and appellant at no time has sought to intervene to prevent such taking.

Considering the above facts, all taken into account by the trial court in reaching its decision, it would appear that the language of the deed is susceptible to an interpretation that the interest conveyed was a right-of-way rather than a fee interest. Being a grant of a right-of-way, the deed neither conveyed a riparian interest to the grantee nor severed riparian rights from the grantors' remaining lands south of the levee. (*Forgeus* v. *County of Santa Cruz* (1914) 24 Cal.App. 193, 199 [140 P. 1092].) Every incident of ownership not inconsistent with the easement and its enjoyment is reserved to the grantor. (*Dierssen* v. *McCormack* (1938) 28 Cal.App.2d 164, 170 [82 P.2d 212]; *Pasadena* v. *California-Michigan etc. Co.* (1941) 17 Cal.2d 576, 579 [110 P.2d 983, 133 A.L.R. 1186]; *Colegrove W. Co.* v. *City of Hollywood* (1907) 151 Cal. 425, 429 [90 P. 1053]; Rest., Property, § 486; 2 Witkin, Summary of Cal. Law, Real Property, § 182, p. 1021.)

Even if the trial court had concluded that the deed conveyed a fee interest to the grantee, it seems clear to us such a conveyance would have no effect on the riparian rights of the grantors' remaining lands not included in the conveyance, absent some expression to the contrary. (*Rancho Santa Margarita* v. *Vail, supra,* 11 Cal.2d 501, 538-539; *Hudson* v. *Dailey, supra,* 156 Cal. 617; Hutchins, Cal. Law of Water Rights (1956) pp. 189-192.)

As shown above, the extrinsic evidence and the deed itself support the judgment of the trial court.

The judgment is affirmed.

Stone, P. J., and Gargano, J., concurred.